[Crim. No. 1461.   Third Appellate District.—January 15, 1936.]

THE PEOPLE, Respondent, v. SANSAR SINGH et al., Appellants.

Ray Manwell and J. Oscar Goldstein for Appellants.

U. S. Webb, Attorney-General, and Neal Chalmers, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendants have appealed from separate judgments of conviction of the crime of assault with a deadly weapon with intent to commit murder. They were jointly charged in two counts of an information, first, with a conspiracy to commit murder, and, second, with an assault with a deadly weapon with intent to kill Beer Singh, a human being. They were jointly tried. At the trial, on motion of the district attorney, the first count was dismissed. Both defendants were convicted on the second count.

Rose Singh is twenty-three years of age. She is the wife of Naurang Singh. She was formerly married and divorced. She is the mother of a minor child by her first husband. For about three years she had been acquainted and was very friendly with the prosecuting witness, Beer Singh, who is an unmarried man employed on the Andreason ranch near Marysville. She often visited with him in his room on that ranch. She was also very friendly toward Sansar Singh who used to be a ranch foreman in the fields at Wheatland, but who for three years had owned and operated a shop in Marysville where he sold tobacco and liquor. For some time Rose had been employed by Sansar in his place of business waiting on his customers and taking care of the store and house, for

which service she received $30 a month. Both Rose and Sansar had separate rooms in the same building, where they slept. Sometimes she prepared meals for both of them. She visited her husband, Naurang Singh, quite regularly, in the separate home which he maintained. He was a laboring man who earned three or four dollars a day. All of these people belong to the Hindu race. Sansar and Beer had been acquainted for several years. They were not particularly friendly, although no serious trouble existed between them. Beer, however, infers that Sansar tried to get him to "watch Amar Singh" who was a competitor of Sansar's in the liquor business in Marysville, with the purpose that he might "kill somebody". The only reason which is suggested by Beer for this request is an inference that Sansar thought Amar had once reported to the officers information which involved him in trouble with the immigration commission, which was subsequently settled. Beer did not patronize Sansar's business, although they always spoke to each other cordially.

On the night of May 25, 1935, the Hindu people held a public celebration in Marysville. Many of them gathered from the surrounding country. The festivities included music, dancing, drinking and feasting. The fete commenced about 9 o'clock in the evening. One of the principal places where the Hindus congregated was the El Dorado resort in that city.

Rose had been tending the counter that evening in Sansar's place of business. He had very few customers. Most of the Hindus gathered elsewhere for the festivities. About 9 o'clock Rose told Sansar she was not feeling well and she then retired to her room where she did a little sewing and prepared her toilet by the use of a lipstick and cold cream for the evident purpose of going out. At 9:30 o'clock Sansar closed his shop with the intention of attending the celebration. He took his automobile, which was parked in front of the building, to a public garage, where it remained the balance of the night and he then mingled with his countrymen on the streets, finally arriving at the El Dorado resort. Immediately after Sansar left his place of business, according to Rose's story, Beer tapped on her bedroom window and told her to come out that he might relate to her some important news. She at once put on her coat and met him on the street. He claims that she came to him of her own volition and without his

invitation and that she importuned him to take her riding in his car. It is evident that both of them were perfectly willing to make the journey together. They left town about 10 o'clock and drove along an unfrequented road a distance of seven or eight miles to a point near which a dredger was stationed. It was dark. The moon was not shining. It does not appear that Sansar knew they had gone riding or that he was aware of their destination. Beer parked his automobile by the side of the road and taking a blanket from the seat of his car they walked down a pathway some distance toward the dredger where he spread it on the ground near a clump of bushes which he found at the margin of an orchard. Both of them testified that they sat there for some time and that there was some demonstration of love between them. They deny that improper relations transpired between them. Rose said that Beer made lascivious and threatening advances toward her and that she fled for protection toward the car where Beer had left his sweater with a revolver in the pocket thereof; that he pursued her, but that she reached the car first and seizing the revolver she fired one shot toward him in her own defense, not intending to hit him, and not knowing whether she did hit him. The bullet, however, struck him in the back beneath the shoulder-blade and passed straight through his body, lodging between the ribs in his chest. He ran down the pathway and fell into a sand-pit. Rose denied that another car arrived in that vicinity or that Sansar or any other person except Beer was present. Sansar also denied that he was there or that he knew anything about the affair. He declared that he did not leave town that night. Realizing that she might have hit Beer, because of his outcry, Rose ran after him calling for him to come back. She failed to find him on account of the darkness, and arriving at the place where the dredger was stationed she threw the revolver into the water which surrounded the machine. The revolver was not recovered. Rose then went to the home of the Lolmaughs which was located a couple of hundred yards distant and told them a fanciful story about being attacked by a friend who had brought her out there in his machine, and of her flight to protect herself. She arrived at the Lolmaugh house at 11:30 o'clock and persuaded them to take her to Marysville in their automobile.

Beer told a very different story. He claimed that Rose importuned him to take her out in his car along a lonely road with which he was not familiar; that at her request he parked his car and walked with her down the pathway to look at the dredger; that they quarreled about a dress which Rose wanted him to purchase for her at a cost of about $10, but which he refused to buy, saying that he had only $1.50. He denied that he took the blanket from his car or that he placed it on the ground near a clump of bushes. He said that they stopped on a bridge and were talking in a friendly manner when he saw another car drive up and park near his own machine. He asked Rose: "Is that Sansar coming to cut us up?" to which she replied, "No, it is none of his business." He testified that he recognized Sansar running down the pathway toward them with a revolver which he fired at him five or six times in rapid succession, and that one bullet hit him in the back as he ran away; that he fell into a sand-pit where he lay for some time in great pain, during which period Rose and Sansar disappeared; that he crawled out of that pit and went to the Manley house near by, arousing them by striking on the house with a club which he had picked up; that he told them he had been shot, and after listening to his story they telephoned for the officers who promptly came from town and took him to the hospital. Beer made statements to the officers immediately after the shooting occurred in which he asserted that Rose shot him. He also told the Manleys the same thing, except that he added his belief that Rose and Sansar had "framed him".

Aside from the statement made by Beer at the trial that he recognized Sansar as the one who shot him, there is no substantial evidence connecting Sansar with the shooting affair, except that after the arrest of both Sansar and Rose some twenty Hindus met in Marysville for the apparent purpose of settling the differences between Sansar and Beer. Sansar had been released on bail and attended that meeting. He was said to have called his countrymen together for that purpose. Two Hindus testified that Sansar or some friend in his behalf said that he would pay Beer $2,000 and his hospital expenses to settle the matter in so far as he was concerned. Several of them stated that Sansar always said he had nothing to do with the shooting, but was willing to make an amicable settlement between himself and Beer. This was refused by

Beer. This circumstance, standing alone, may be explained on a theory of the innocence of Sansar, as well as otherwise. At the trial a very complete alibi was established in behalf of Sansar.

Upon the foregoing facts both defendants were convicted of the charge of assault with a deadly weapon with intent to commit murder. Separate judgments were rendered against them. From these judgments both defendants have appealed.

The appellants contend that the verdicts and judgments are not supported by the evidence, that reversible errors occurred in the course of the trial and that the prosecuting attorneys were guilty of prejudicial misconduct consisting of statements which they made in their arguments to the jury to the effect that the Hindu people were notorious murderers and perjurers.

A conclusive alibi was established in behalf of Sansar Singh which requires a reversal of the judgment with respect to him. Eight white witnesses testified to facts which are undisputed, except for the inherently improbable statement of the prosecuting witness, making it impossible for Sansar to have been present or to have participated in the shooting of Beer Singh.

The shooting occurred at 11 o'clock at night. That fact is established without conflict of evidence. The Lolmaugh residence is situated "almost within a stone's throw" of the place where the shooting occurred. Mr. and Mrs. Lolmaugh and their oldest son were playing cards in their home at that time. They had just finished a game when Mr. Lolmaugh looked at the clock and remarked that it was then five minutes to 11 and time to go to bed. As usual, they agreed to play "just one more game" before retiring. They had scarcely commenced the game when a single shot was clearly heard near by. Mr. Lolmaugh arose and turned on the porch light to investigate the cause of the shooting. He was able to see nothing and they heard no other shots, so he returned to resume the game. All of the members of the Lolmaugh family agreed that it was then within a couple of minutes of 11 o'clock and that not more than one shot was fired. There is no evidence to the contrary and we must assume the shot was fired at that time.

The undisputed proof establishing the alibi of Sansar beyond doubt consists of the following evidence: He owned

only a five-passenger black Chevrolet sedan which he drove into a public garage at 9:30 o'clock that evening when he closed his place of business. His automobile remained in that garage all night. No one testified that he saw Sansar drive out of the city or return to it that night. Eight white, reliable witnesses saw him and talked with him at different times that night between 10:30 and 11:15 o'clock, during which time the shooting occurred. Four of those persons saw him in the city between ten minutes of 11 and three minutes after 11 o'clock. James Purrington, a prominent farmer who had lived all of his life a few miles south of Marysville, and who was acquainted with Sansar, testified that in company with his wife and their neighbor he was searching for a friend in Marysville when they met Sansar on the south side of Third Street at 10:45 or 10:50 o'clock, and stopped to talk with him for a few minutes. He said: "I talked to him (Sansar) because I was looking for James, and Sansar knew James. I stood there and talked a few minutes hoping that Jimmie would show up. . . . I looked at my watch . . . and it was ten minutes to eleven when I left that corner." Mrs. Lucille Purrington testified that they met Sansar at that point on Third Street and that her husband talked with him so long that she "became impatient". She said that as they left him her husband took out his watch and remarked that it was then ten minutes to 11 o'clock. Mrs. Bertha Norcross, a neighbor of the Purringtons, corroborated that evidence, testifying that they met Sansar near the Garrett & Company's place of business on Third Street; that Mr. Purrington introduced him to her and stood there five minutes or more talking with him; that they were looking for a friend who promised to meet them about that time, and that when they left Sansar, Mr. Purrington looked at his watch and remarked that it was then ten minutes of 11 and that they would not wait much longer for Jimmie. Mr. Gus Alex, a white man, a produce dealer and a professional wrestler, testified that he met Sansar, with whom he was well acquainted, in the El Dorado resort in Marysville, where many Hindus had congregated that night; that it was then about 10:30 o'clock, and he talked with him for fifteen minutes, and then left the resort. He testified that he again returned to the El Dorado resort at about 11 o'clock and found Sansar there at that time. He said he came back and found Sansar there

"exactly at three minutes after eleven. . . . I . . . looked at the big clock . . . outside the door on the corner of the building." Mr. Booth, the night watchman of Marysville corroborates the latter portion of the last-mentioned statement. He says that he was on duty that night and entered the El Dorado resort at 11 or 11:15 o'clock and saw Sansar standing there watching a blackjack game. Mr. LeBoeuf, a police officer of that city, testified that he met and talked with Sansar on Third Street "about ten-thirty" o'clock the night of the shooting. Mr. McFarlane, a special police officer of Marysville, testified that he also met Sansar on Third Street that night "about ten-thirty or ten thirty-five". And finally Frank Graves, an attorney at law of that city, testified that he was personally acquainted with Sansar and that he met him in town twice that night: First at the corner of Third and D Streets at 10:20 to 10:30 o'clock, and the last time Graves saw him was when he came out from a restaurant at 11:30 o'clock. Since it was not possible for Sansar to have procured a machine and to have driven fourteen miles out to the dredger and back, with the necessary delays of starting his engine, parking his car and running some distance down a pathway in pursuit of his purported victim while he emptied the chambers of his revolver, in thirteen minutes from the time the Purringtons left him on Third Street until he was again seen in the El Dorado resort, even if he had known exactly where to find Rose and Beer, it is certain that Sansar was not at the place of the shooting when it occurred at 11 o'clock, and that he did not participate therein. There is no escape from this inevitable conclusion.

It is true that jurors are privileged to disbelieve witnesses for cause and that proof of an alibi may fail when it conflicts with other reliable testimony or when it is inherently unbelievable, but, in the present case, it may not be said the convincing evidence of the several unimpeached white witnesses is overcome by the inherently improbable story of Beer Singh with all of its discrepancies. The evident disregard of the conclusive effect of the proof of a complete alibi in the present case in behalf of Sansar indicates that the verdict against him was the result of race prejudice, particularly in view of the prejudicial statements of counsel in that regard, which were approved by the court. At least the verdict

against Sansar is contrary to the convincing facts of the case and therefore should not be permitted to stand.

The alibi is also supported by other evidence and by the substantial impeachment of Beer's testimony which necessarily follows the contradictory and unbelievable statements which he made regarding the essential circumstances of the affair. Both defendants testified that Sansar was not at the place of the shooting. Rose took the witness stand and admitted that she fired one shot at her companion, but asserted that she did so in defense of her person. At the trial Beer testified that he did not take his blanket from the machine or spread it on the ground beneath the clump of bushes. He says that he recognized both Sansar and his machine as he drove up and parked his automobile beside his own car. He asserts that Sansar came running down the pathway and that he fired five or six shots at him in quick succession. These statements are necessarily false. It was dark. The moon was not shining. It is improbable that Beer could have recognized either a person or a car at that distance under the circumstances. It is absolutely certain that Sansar's machine was not there. It is an undisputed fact that it remained in the public garage all that night. The members of the Lolmaugh family, who lived near by, and who distinctly heard the shot which Rose fired, declared that only one shot was fired. The following morning the sheriff and his officers found Beer's blanket spread out beside the clump of bushes, together with Rose's white gloves and a fifty-cent coin. It is not unlikely Rose resented Beer's effort to compensate her with a four-bit piece instead of buying her the ten-dollar dress which she coveted. After Beer climbed out from the sand-pit into which he had fallen, he went to the Manley home near by, where he arrived at 11:30 o'clock, and pounded on the house with a club to arouse the inmates thereof. They promptly came out and found him lying on his back suffering from a painful wound. They thought he was drunk and asked him what had happened. He replied that he had been shot. When they asked him who shot him he said that Rose shot him. On cross-examination of Mr. Manley he said that Beer told him Rose and Sansar "framed him", and that when Rose saw Sansar coming toward them from the machine, *she* shot him. Mr. Manley telephoned to the officers who promptly drove out from Marysville and took Beer to the

hospital. In the presence of the sheriff, the physician, nurse and other persons, Beer, expecting to die, made a declaration concerning the affair which was taken down in writing and which was received in evidence without objection. This statement also asserts that Rose did the shooting. It reads:

"My name Beer Singh; work for Andreasons. Yuba City. Rosie at store. Rosie asked me to take a ride. Asked me for ten dollars. No give it to her. We drove to the dredger. Asked me to get out and walk to the dredger. On the way she shot me, and I run away. Sansar drove up in car. When she saw the car she commenced shooting, and I started running. I recognized Sansar in car. Also know his car, and voice. My name Beer Singh. I made the statement knowing I am going to die. I am going to die, I guess I will know when I die.''

It is true that two Hindu witnesses claimed to have seen Sansar in a *green* coupe car that night in Marysville at about 10:30 o'clock on C Street. They did not see him drive out of town. Their statements may be reconciled with the other evidence concerning the alibi. He may have driven directly to the El Dorado resort where he was seen about that time by several persons. Probably he did not enter a green car. They may have seen him driving his own machine to the garage at 9:30 o'clock. Sansar did not own a green coupe. The green car is not accounted for. If Sansar had a Hindu friend who owned a green coupe in or near Marysville it should have been easy to locate that car. These Hindu witnesses were Eshar Singh and Briam Singh. Eshar, who worked on the Andreason ranch with Beer Singh, said that he saw Sansar come from his place of business at about 10:30 o'clock that evening and enter a *green* coupe machine alone and drive down C Street. Briam Singh merely said that he stood in front of Daman Singh's store on B Street at about 10:30 or 10:40 o'clock that evening and recognized Sansar as he drove by in a coupe car.

The evidence that Sansar could not possibly have been at the place of the shooting at 11 o'clock that evening is most convincing. His alibi is conclusively established without substantial conflict. It necessarily follows that there is no reliable evidence to support the theory of the prosecution that Sansar shot Beer Singh. It is therefore necessary to reverse the judgment with respect to Sansar Singh.

The appellants contend that the court erred in sustaining respondent's objection to their question propounded to Sansar for the purpose of explaining the trivial nature of the difficulty which existed between him and Amar Singh so as to rebut the inference of Beer that Sansar sought to kill him because he had refused to "watch Amar" at the request of Sansar so as to get a chance to kill Amar. An objection on the part of the prosecution was sustained to the following question asked of Sansar by the appellants, to wit: "Q. Did you have any trouble [with Amar] at all?" Certainly this question called for competent evidence. The theory of the prosecution was that Sansar had induced Rose to entice Beer out to the vicinity of the dredger so that he could follow them and kill Beer because he had refused to serve him as a spy against Amar whom Sansar planned to kill because he was supposed to have furnished information to the immigration officers which caused Sansar trouble. It became very important to determine the cause and extent of the enmity, if any, which existed between Sansar and Amar. That was the very purpose of this question. The answer should have been received, and the defendants should have been permitted to develop that subject.

The objection should have been sustained to the question which was propounded by the prosecution on cross-examination of defendants' character witness, as follows: "In 1925 you were running a store down here with Mr. Manrow, *who got killed by another Hindu?*" Clearly this was intended to prejudice the jurors against the Hindus as a race. It was incompetent and improper. The objection to that question should have been sustained.

It was prejudicial misconduct for the prosecuting officer to argue to the jury in effect that it is characteristic of the Hindu race to murder their people in a mysterious manner, to mutilate their bodies, and to come into court and lie and to do all they can to defeat justice. It was error for the court to refuse to instruct the jury to disregard that language. That language has no legitimate application to the issues before the jury in this case. It is a clear appeal to race prejudice, which practice has been uniformly discountenanced by the courts. (*People* v. *Simon*, 80 Cal. App. 675 [252 Pac. 758].) The case of *People* v. *Lee Yick*, 189 Cal. 599 [209 Pac. 538], upon which the respondent relies in support of

these statements is not in point under the circumstances of this case. The syllabus of that case correctly states the ground upon which that alleged prejudicial statement was held to be harmless. It is there said:

"It was not misconduct for the district attorney in his presentation of the case to the jury to make reference to tong wars, since it is a matter of common knowledge that the Chinese resort to systematic murders of members of opposing tongs in order to carry out their purposes."

The comment which was approved in the Lee Yick case has reference to a Chinese tong organization commonly known in California to have participated to an alarming extent in secretly killing Chinese individuals in what has been familiarly known as "tong wars". That was a reference to the common knowledge of the unlawful practices of Chinese tong organizations. It did not reflect upon the characteristics of a nation as a whole. In that case a mysterious murder was involved. It appeared that the defendant, as second president of a certain Chinese tong, had given orders to the members of his tong to kill the deceased. There was evidence implicating the defendant's Chinese tong in the murder of the deceased, and it was, therefore, proper to refer to the methods of the tong in carrying on its warfare. No such situation exists in the present case. No Hindu organization was involved in this case. No secret unlawful Hindu organization was mentioned. The challenged language of the prosecuting attorney in this case was specifically directed to alleged "characteristics of the *Hindu people*". It is undoubtedly true that certain Hindu individuals resort to secret and ruthless murder, and that they do not hesitate to perjure themselves in our courts, but that does not justify the conviction of a Hindu without evidence that he belongs to that class, on the theory that such depraved conduct is characteristic of the entire race and that the accused should therefore be convicted on general principles. The same charge of secret inhuman murder and indiscriminate perjury may be attributed to such organizations as the former Capone gang of Chicago. Certainly that will not justify one in asserting that such gangster methods and outlaw conduct are characteristic of the American people as a nation. Our laws justify the conviction of an accused person only upon competent evidence of his guilt of a specific offense. It does not warrant

a conviction by an appeal to race prejudice or by reference to common knowledge of mere general race characteristics.

■ Since the theory of the prosecution upon which both defendants were convicted was, and could be based only on the assumption, according to the testimony of Beer Singh, that Sansar personally fired the shot which injured him, and that Rose was also guilty only because she was present and aided and abetted him in the commission of that crime, it necessarily follows that, since we have held that the evidence conclusively shows without reliable contradiction that Sansar was not present and did not fire the shot, Rose was improperly convicted as an accessory. ■ If she is guilty of an unlawful assault with a deadly weapon, she should be tried and convicted only as the principal who personally fired that shot. She freely admits that she fired the shot, but she claims that she did so in necessary self-defense. The jury should be given a fair opportunity of determining whether she did act in necessary self-defense. She is entitled to have this issue presented to a jury free from the confusing and erroneous theory that Sansar himself did the shooting. For that reason we are of the opinion the judgments should be reversed with respect to both appellants.

The judgments are reversed and the cause remanded for a new trial as to Rose Singh.

Plummer, J., and Pullen, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 13, 1936.