[Crim. No. 1691. Third Appellate District.—October 31, 1939.]

THE PEOPLE, Respondent, v. ROBERT GRIMES et al., Appellants.

Richard H. Fuidge and Erling S. Norby for Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

TUTTLE, J.—Defendants were each charged in two counts of an indictment, with,—

(1) Kidnaping, under the provisions of section 207 of the Penal Code; and

(2) Kidnaping, with intent to extort money, under the provisions of section 209 of the Penal Code.

They were tried jointly before a jury in the county of Sutter, and each was convicted upon both counts. Each defendant moved for a directed verdict, for judgment notwithstanding the verdict, and for a new trial, all of which motions were denied. Upon the same record each appeals from the judgment of conviction, and from the orders denying their respective motions. Under the provisions of section 1237 of the Penal Code there is no appeal from an order denying a motion for judgment notwithstanding the verdict, nor is there any appeal from an order denying a directed verdict in favor of the defendants. The appeal will be considered as being one from the final judgment of conviction, and from an order denying a motion for new trial.

 Taking up first the appeal of Robert Grimes, it is urged that the evidence is insufficient to sustain the conviction. The basis for this contention rests to a great extent upon the fact that defendant's evidence of an alibi was not controverted by any substantial evidence, and that the only reasonable construction that could be placed upon the evidence is that this defendant was not present at the scene of the crime when it was committed, and it was therefore the duty of the jury to acquit him. The determination of this question necessarily involves an examination and close scrutiny of the evidence.

W. R. Meeks and his wife, Mrs. Norma Meeks, resided on a ranch at Rio Oso, Sutter County, California. On the evening of September 1, 1938, they were in their home engaged in playing cards with a few friends. After these friends left the house, and at about 11:30 o'clock, Mrs. Meeks was seated at a card-table working on some account books connected with the administration of the ranch. After she had been working a few minutes, she looked up and saw two men in the entrance between the living-room and the dining-room. One man was standing near the door, and the other was standing near the opening into the dining-

room. The man who stood near the door had a gun in his hand, which was pointed toward her. The faces of both men were covered with a material of light color, from the eyes down. The man with the gun wore a white cap. They commanded Mr. and Mrs. Meeks to lie on the floor face down, and the order was complied with. The men stated that if there was any noise made they would shoot. One of the men came from the back of the house carrying some white material and he blindfolded them and tied their hands. They secured the keys to the automobile from the husband, and Mrs. Meeks heard the car start up and then stop in front of the house. The man with the gun ordered her to stand up, and walked her out of the house, and put her in the back seat of the car. The second man came out of the house and got in the back seat of the car with Mrs. Meeks, and the car started up and turned east on the highway. Mrs. Meeks testified that she was very familiar with the roads in that vicinity, and that she was positive that they drove through the town of Sheridan, as she could see the red light on the railroad track and knew that they were crossing these tracks. They then proceeded over a rough road, and after driving awhile the car stopped. They directed Mrs. Meeks to get out of the car, and she started to walk over the hill and through a wire fence. She stated that her blindfold was up, and that she could see the man who was with her, although his face was covered. This man, who had the gun, wore white shoes. The second man wore black shoes. After walking a distance they all sat down until daybreak. Only one of the men stayed with Mrs. Meeks at that time. One of the men smoked cigarettes. At daylight the men commanded Mrs. Meeks to stand up, and they all walked over the hills in the direction from which they had come. After walking for some time they came to a patch of poison oak shrub, which they entered, and where Mrs. Meeks stayed until Sunday morning. Her blindfold was up so she could see when she reached this hideout. She testified that the man who was with her during this time slept occasionally, and that she could see his face on several occasions. He threatened her with a gun if she made any noise. When he was asleep he had his mask off and she could see his face. She observed that he was wearing white shoes,—''a white leather shoe with raised seams from the toe to the instep or to the last''. She noticed blond or reddish

blond hair on his ankles over an inch long. About 4 o'clock Saturday morning the man who was with her handed her a small piece of cheese which was done up in an oiled paper wrapping. "He told me that the other man had brought the cheese to him; he stated that this other man had brought a newspaper which stated that my husband had put the matter in the hands of the law, and the 'boss' had sent word for him to blow my brains out and throw me in the river." She told him she would do everything in her power to keep the law away from him, and he finally said he was not going to shoot her. About 5 o'clock on Saturday afternoon the man with the white cap who had walked away, returned and told Mrs. Meeks to be quiet and not to move, and that he would come back and get her that evening and take her home. She said she had seen the man since that time, and he was in the courtroom; his name was Robert Grimes. Defendant Robert Grimes stood up, and Mrs. Meeks stated that he was one of the men who was with her upon the occasion mentioned. Both the men having left her alone, Mrs. Meeks finally left the place where she was concealed, and walked along the county road. A man driving along the road offered to take her home, and she thereupon was driven back to the ranch. Mrs. Meeks stated further than the second man resembled in appearance and build, defendant Ollen Grimes. The testimony of the husband, W. R. Meeks, is substantially the same as that of his wife concerning everything that took place at the ranch. He testified that after the two men had led his wife out to the car in front of the house, one of them returned and asked him if he could raise $25,000. He told them it could not be done. The man then said, "Do you realize that kidnaping means the electric chair to me if I am caught, and I don't intend to be caught; you do as I say O.K. or you will never see your wife again." This man went out the front door and returned a second time and asked Mr. Meeks if he could raise $15,000. The husband replied that he did not know whether or not it could be done, but that he would try. The man replied, "If you don't, you will never see your wife alive again." This man then told Mr. Meeks to leave the money at the first bridge off the Bear river bridge south of Wheatland on 99. He did not see his wife again until Monday morning, September 4th.

Sheriff Ullrey testified that shortly after Mrs. Meeks had been taken from the home, he examined the ground across the road from the Meeks' home. He found two tracks leading into the orchard on the north side of the road, and followed them to a point where the dirt had been deposited during the excavation of an irrigation ditch. He found two places which indicated that two persons had sat on the bank of the ditch. He saw two different foot-prints. They were about the same as to size, and the toes were pointed. One had a diamond design on a rubber heel, and the other had a rubber heel with the trade-mark "Runner". Hugh Hensley testified that he visited the poison oak patch where Mrs. Meeks was concealed on September 4, 1938, and found cigarette stubs, matches, a piece of wrapper, like a cellophane wrapper, a piece of cheese, and a piece of tinfoil. C. Hites, an orchardist living about one mile from the Meeks' place, testified that the defendants worked for him in December, 1936. Daniel H. Carey testified that he owned a ranch adjoining Meeks' place, and that Robert Grimes worked for him during January, 1938. He testified that due to the fact that he had some eye trouble, the checks with which Robert Grimes was paid were drawn jointly by him and Mrs. Meeks, and that Mrs. Meeks' name appeared on all of these checks. Mrs. Ethel Taillifer testified that she operated a general store about seven miles south of Marysville, on the west side of highway 99–E. She stated that on the evening of September 2, 1938, she sold some "Wing" cigarettes, beer, cheese, bread, beans and corned beef to a man whom she identified in the courtroom as Ollen Grimes. The cheese was wrapped in cellophane. She stated that this defendant had no automobile. W. W. Irvine testified that he and his wife ran a soda-fountain and lunch place in Yuba City, and that around midnight of September 3d, or early in the morning of September 4, 1938, the two defendants came into his place of business and had four cups of black coffee. He testified that Robert Grimes was dressed in dark clothes, and that he looked as though he was very sleepy or sick. His face was flushed. Mrs. Lucy Irvine, wife of the last-named witness, testified that the two defendants entered their place of business in the same manner as indicated by her husband. She identified the two men positively as the defendants on trial. She stated that the younger man wore white shoes, and that by the word "younger" she meant Robert Grimes, whom

she pointed out in the courtroom. She testified that his face was very flushed, and that he kept rubbing it intensely, and seemed ill; that both defendants drove up in an automobile, and she saw them get back into the car and drive off; that while they were in her store they appeared highly nervous.

Each of the defendants testified in his own behalf. Each denied any connection with the affair, and testified that on the evening of September 1st, and at the time the offense was committed, they were at another place; they stated that they were together at all times. Julius Offsky, a pawnbroker doing business in Sacramento, testified that he purchased a suit from defendant Ollen Grimes on the evening of September 1st. A record of the purchase was admitted. The time was indicated as 10:30 A. M. James Dickerson testified that he met the defendants walking across the American River bridge toward North Sacramento, and that one of them wore white shoes. He could not recall the exact date, placing the time as the latter part of August, 1938. He stated it might have been the 1st of September, but he was not positive. The defendants testified that they boarded a freight train out of Roseville on the evening of September 1st, and traveled by way of Stockton and Los Angeles until they reached Louisville, Kentucky, at 5:30 P. M. on September 12, 1938.

With respect to defendant Robert Grimes, it is at once apparent from the foregoing record that the case is not one involving a conviction based upon circumstantial evidence. On the contrary, there is a positive identification of this defendant by Mrs. Meeks. There are also other facts and circumstances proven against both defendants, and which will be referred to in connection with the appeal of defendant Ollen Grimes.

Taking up the appeal of the last-named defendant, it is earnestly contended that he was never identified by Mrs. Meeks or her husband as one of the two persons who kidnaped them, and that he was convicted chiefly upon the fact that he was a brother of Robert Grimes. It is argued that this defendant was convicted upon suspicion and conjecture, and that there is a total failure of proof of guilt. Our opinion is that there is sufficient evidence in the record to justify a finding by the jury that both defendants were guilty of the offenses charged. As we have stated, defend-

ant Robert Grimes was positively identified by Mrs. Meeks as one of her abductors. She and Mr. Meeks also testified that the general build of one of the men who committed the offense was similar to that of defendant Ollen Grimes. She saw Ollen Grimes at her home before being blindfolded, and talked with him several times, and although he wore a mask at the time, she had ample opportunity to familiarize herself with his general physical characteristics, excepting the appearance of the lower part of his face, which was hidden by the mask. There is testimony that the defendant Ollen Grimes purchased cheese on the same day when it was delivered to Mrs. Meeks in the poison oak patch. There is the testimony of Mr. and Mrs. Irvine to the effect that both defendants entered her place of business near Marysville about midnight on September 3, 1938. There is further testimony by the defendants themselves that at no time during the time covered by this episode were they separated; they stated that they were constantly together.

As to the defense of an alibi, except for the testimony of the defendants themselves, there is no evidence produced in their behalf which would positively prove that they were in Roseville or Sacramento, or any other place than the scene of the crime at the exact time of the commission of the offense. The testimony of the pawnbroker placed them in Sacramento at 10 o'clock in the morning of the day the crime was committed. As the scene of the crime is distant some fifty miles from Sacramento, and as the crime was committed between 11 and 12 o'clock P. M. of that day, we are unable to agree with counsel for appellants that there is anything conclusive in connection with the testimony of the pawnbroker. The testimony of Mr. Dickerson is equally as inconclusive, as he was not positive as to the day he saw defendants between Sacramento and North Sacramento. He stated it might have been September 1st, but he was not sure of it. It is true that the jury might have inferred from testimony of this character that the defendants were not at the scene of the crime when it was committed. This, however, is a question of fact which the jury resolved against the defendants, and we cannot say that their conclusion lacked evidentiary support. "An appellate court has no power to set aside a verdict unless it clearly appears that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People* v. *Latona*, 2 Cal. (2d)

714 [43 Pac. (2d) 260].) "The reviewing court must assume, in favor of the verdict or decision, the existence of every fact which the jury or judge could have reasonably deduced from the evidence, and then determine whether guilt is deducible therefrom." (*People* v. *Rose*, 26 Cal. App. (2d) 513 [79 Pac. (2d) 737].)

Defendants, in connection with the evidence purporting to establish an alibi in their behalf, rely upon the case of *People* v. *Singh*, decided by this court and reported in 11 Cal. App. (2d) 244 [53 Pac. (2d) 403]. In that case a judgment of conviction was reversed, as it was held a conclusive alibi was established on behalf of the defendant, who was a member of the Hindu race. The only evidence connecting the defendant with the commission of the crime of assault with a deadly weapon with intent to commit murder, was the testimony of the prosecuting witness (another Hindu). Eight disinterested white witnesses testified in behalf of the defendant, and stated that at the exact time the offense was committed, the latter was on the streets of Marysville, and their testimony was held by the court to have established conclusively that the defendant was not present at the scene of the crime at the time of its commission. It appears from the opinion, however, that these facts alone did not impel the conclusion reached by the court. The other factor which was persuasive in arriving at a reversal of the case appears in the following language taken from that opinion: "The evident disregard of the conclusive effect of the proof of a complete alibi in the present case in behalf of Sansar indicates that the verdict against him was the result of race prejudice, particularly in view of the prejudicial statements of counsel in that regard, which were approved by the court." Thus, the case can be readily distinguished from the instant case, first: on the ground that the evidence of the alibi, from disinterested witnesses, if believed by the jury, made it *impossible* for the defendant to have been at the scene of the crime when it was committed; and second: it appears in the record that the jury must have been influenced by the prejudicial statements of counsel in appealing to race prejudice. Our conclusion is that there was sufficient evidence in the record to support the verdict against each of the defendants.

It is contended in respect to both of the defendants that the trial court committed prejudicial error in the

matter of admitting evidence of a former offense. When the defendant Ollen Grimes was on the witness-stand, the district attorney asked him the following question: "Now, Mr. Grimes, did you not, on or about the 22nd day of April, 1938, plead guilty to a crime of felony, to-wit: violation of Section 538 of the Penal Code, in the Superior Court of the State of California, in the County of Placer?" To this question the defendant answered: "I did." The section referred to provides in effect that every person who, after mortgaging his property, causes the same to be sold, is guilty of larceny. It is the contention of appellant that there is no evidence showing that the crime to which this defendant plead guilty, was a felony. Upon further examination by his own counsel this defendant testified that the mortgaged property consisted of a number of turkeys. He testified that he had the turkeys mortgaged, and sold them and kept the money; he stated that the number of turkeys sold was three hundred and fifty. It further appears from the evidence that the amount of the mortgage was $750. Under the provisions of section 487 of the Penal Code, subdivision 1, when the personal property taken consists of domestic fowls, and the value thereof exceeds $50, the crime shall constitute grand theft. Larceny is now denominated in the Penal Code as theft, and grand theft is made a felony under the provisions of section 489 of the Penal Code. It appears from the record that the former crime was committed jointly by both of these defendants, and the evidence of the former offense with respect to each is substantially the same. The facts that turkeys were mortgaged for $750, and that they numbered three hundred fifty, were sufficient to justify a finding by the jury that the value of the turkeys sold exceeded the sum of $50. We believe that under the circumstances a prior conviction of a felony was shown with respect to each of the defendants.

Lastly, it is urged with respect to each of the defendants that there is a fatal variance between the allegations of the indictment and proof. In the second count it is urged that the defendants "did kidnap and carry away one Norma Meeks, with intent to restrain said Norma Meeks, and thereby commit extortion, and extract from the *relatives* and *friends* of said Norma Meeks, money and other valuables". It is argued by appellants that the only demand made upon anyone was made upon the husband of

the victim, and that a husband is neither a *relative* nor a *friend* of his wife. In support of this contention it is pointed out that under the laws of succession and inheritance, a husband is not a "relative". We are of the opinion that the word "relative", as used in section 209 of the Penal Code, which defines crime charged in the second count, is not used in a technical sense, but was intended by the legislature to be employed according to the language found in the *Estate of Sowash,* 62 Cal. App. 512, at page 516 [217 Pac. 123], which is as follows:

"The word is a very general and comprehensive term, and may include in its generic sense every relation that arises in social life. (*Esty* v. *Clark,* 101 Mass. 36 [3 Am. Rep. 320].) Lexicographers have defined it as signifying a relation in general so as to include relationship by blood or affinity. In its widest sense, therefore, the word no doubt has this meaning."

Neither would it do violence to the English language to hold that under ordinary circumstances the husband is a "friend" of his wife. The point is without merit.

Our conclusion is that each of the defendants was fairly and impartially tried and convicted, and that the appeal is without merit.

The judgment and order denying the motion for new trial, in respect to each defendant, are affirmed.

Pullen, P. J., and Thompson, J., concurred.